Brophy and Co. v. Commissioner.
Brophy & Co. v. Commissioner
Docket No. 8685.
United States Tax Court
1946 Tax Ct. Memo LEXIS 97; 5 T.C.M. (CCH) 753; T.C.M. (RIA) 46213; August 26, 1946
*97 G. Q. D'Albini, C.P.A., 301 U.S. Bank Bldg., Medford, Ore., for the petitioner. Leonard A. Marcussen, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion This proceeding involves deficiencies of $2,221.47 and $69.56 in petitioner's income tax and declared value excess profits tax liability for the calendar year 1942. The sole question involved is whether the Commissioner erred in including in petitioner's income a profit of $13,769.22 purported to have been realized by petitioner as gain on an involuntary conversion of certain property. A loss deduction in the amount of $1,715 claimed in his petition has been abandoned by petitioner. Findings of Fact Petitioner is a corporation organized in 1927 under the laws of the State of Oregon and has its principal office at Medford, Oregon. At all times petitioner has been engaged in the business of raising and feeding livestock and in raising and producing livestock feed. It filed its return for the taxable year ended December 31, 1942 with the Collector for the District of Oregon. The original stockholders of the petitioner company were H. R. Welch, R. F. Moran and V. D. Brophy. Welch owned *98 51 per cent and the balance of the stock was held equally by the other two shareholders. In January, 1942, the stockholders were the widow of H. R. Welch, the Welch Investment Company and V. D. Brophy. In January, 1942, or shortly thereafter, V. D. Brophy purchased the stock of the other shareholders. Under date of July 31, 1929, the petitioner executed an "Agreement of Lease and Option" by which H. R. Welch and Rhoda Welch leased to the petitioner for a period of 10 years from December 1, 1926, certain described real estate and water rights. The property in question, together with some other personal property, had been the subject of prior lease and use arrangements between the same or related parties. In the agreement the petitioner was given an option to purchase the property for $225,000 at any time during the life of the lease. The instrument provided that the petitioner should pay all taxes and public charges that should be levied against the real estate, should pay a rental of $2.50 per acre for each acre of water rights and that petitioner should pay an annual rental of $5,000 per year for each of the last 5 years in the term of the lease. If the option was exercised each *99 of the $5,000 rental payments was to be applied as part of the purchase price. The petitioner never exercised the option or otherwise obtained title to the real property or water rights covered by the lease. Some of the personal property mentioned in the lease agreement was property that had been subject to prior leasing arrangements but which was noted as having been since acquired by and as then belonging to the petitioner. Certain other personal property then belonging to the Rogue River Valley Canal Company was also mentioned and under the terms of the agreement the lessor was to obtain title and the petitioner was to account to the lessor for the property itself or its equivalent. None of the personal property was in any way described, and there is nothing to indicate the value placed thereon. An earlier leasing arrangement of 1922 was spoken of in connection with the Rogue River Valley personal property and it appears that the petitioner's duty to account for it was according to the terms of such agreement. The personal property in question was also made subject to the terms of the lease and option and was covered thereby as if described and set out therein. It was further noted *100 that some of the personal property was perishable and not then in existence. Although it had never exercised the option the petitioner, at the time of its organization in 1927, recorded the leased property on its books as follows: ASSETS: (among others)
Land - Original option
$100,916.70
Buildings - Original option
10,500.00
Water - Original option
86,000.00
Improvements - Original option
4,497.12
Cattle - Original option
77,580.00
Horses and mules - Original option
8,675.00
Poultry - Original option
123.00
LIABILITIES: (among others)
Stewart and Welch - Option
$225,000.00
Stewart and Welch - Account
61,244.85
Its books of account as thus opened were kept in complete double entry form down to December 31, 1942. When certain of the water rights covered by the lease were sold by the lessor during the term of the lease for $26,000 petitioner made an adjustment on its books by debiting the liability account in the amount of $26,000 and crediting the water rights account in the same sum. Petitioner did not receive any of the sale proceeds. Thereafter the option liability was carried on the books at $199,000. Petitioner occupied the premises *101 during the full term of the lease, although it never paid the annual rental of $5,000 agreed upon for each of the last five years of the term. Petitioner did not claim a deduction from gross income for any of the $5,000 rental payments and did not accrue such amounts on its books. The water rental, taxes and assessments were paid by the petitioner. After the expiration of the lease in December, 1936, petitioner continued in possession of the leased property by sufferance until February, 1942, when the United States Government acquired the larger part of the real estate through a condemnation proceeding for use as a military camp. The petitioner was not a party to the condemnation proceeding and it received no part of the award for the premises in question. Petitioner continued in possession of about 1,500 acres of the leased premises that had not been taken over by the Government and has paid the lessor a rental of about $1,800 per year. The personal property for which petitioner was responsible under the terms of the lease was returned or accounted for through payment and the petitioner had no gain with respect to it. The petitioner adjusted its books to take care of the above transaction *102 by several reversing entries which consisted of a cash payment of $12,000, * property surrendered $165,413.82, adjustment in value of implements, $3,227.60 and cancellation of two accounts running to the Welch interests totaling $4,589.36. The entries totaled $185,230.78 and when deducted from $199,000, the figure at which the option liability was carried on the books, left a balance of $13,769.22. This latter figure the petitioner's accountant labeled as "Gain from involuntary conversion" and reported the transaction on petitioner's income tax return for 1942, although that sum was not taken into the company's taxable income on the tax return. Upon the basis of the information reflected in the return and in a letter of protest filed by the petitioner, the respondent determined a deficiency, stating in the notice: (a) It is held that the entire net gain in the year 1942, from the involuntary conversion of ranch properties owned by you, is taxable in that year as net gain. An adjustment for a loss in connection with a property known as "Spokane *103 Orchards", another property actually owned by the petitioner which was also condemned by the Government, upon which petitioner sustained a loss of $4,813.78, was allowed by the respondent, thus reducing the net gain in question to $8,955.44. The petitioner was not the owner of the property in question, and did not receive any of the proceeds of the condemnation award. The personal property mentioned in the lease was paid for by petitioner or otherwise accounted for and he realized no gain in connection therewith. Profits from the sale of cattle, fruits, etc., were reported for income tax purposes in the years realized. Opinion ARUNDELL, Judge: In determining the deficiency the respondent was apparently under the impression that the petitioner had exercised the option and had become the owner of the properties covered by the lease prior to the time when the larger part of the property was taken over by the Government. Since the option price (adjusted for sale of water rights by the lessor) was carried as a liability of $199,000 on petitioner's books and, since the petitioner's statement indicated that such liability had been released and cancelled by virtue of various credits *104 totaling $185,230.78, the respondent seems to have reasoned that the petitioner realized a gain of the balance of the liability, $13,769.22, as a result of a forgiveness of the debt by its creditor, the lessor. The difficulty stems from the unorthodox entries on petitioner's books and the view taken by its accountant that the leasehold property and improvements in question belonged to petitioner and the option figure constituted a real liability of petitioner. This, of course, was not true and, moreover, the option had expired in 1936 and had never been extended. The original entries in petitioner's books connected with the leasehold properties were made in 1927. The accounts had never been changed except that the original liability of $225,000 was reduced to $199,000 at some time prior to 1936. The accountant who has closed petitioner's books each year since 1936 and who has also prepared petitioner's tax returns since that date did not go into the question of whether the option had ever been exercised. In 1942, after the petitioner had been required to surrender the leasehold property which it then used and which it had used at the sufferance of the owner since 1936, the account *105 sought some way to remove the old liability account from the books. The adjusting entries were made for that purpose alone. It appears that the leasehold assets, together with other assets owned by the petitioner, had originally been placed on the books at what the company considered their fair value at the time. Mr. Brophy who controlled the petitioner in 1942 was not an accountant and did not understand the book accounts at all. It is clear that the book entries do not represent the facts as they in truth exist. Such entries alone are no more than evidential and when they are found to be at variance with the real facts, decision must rest on the facts. . On brief the respondent conceded that the petitioner had never exercised the option, was not the owner of the assets and, therefore, could have received no gain from an involuntary conversion. However, the respondent has advanced an argument that the petitioner may have realized gain in connection with the Rogue River Valley Canal Company personal property mentioned in the lease and option agreement. Under the agreement it appears that such property was to be included in *106 the option price if the option was exercised, otherwise petitioner was to return the property, or account for it at the termination of the lease. The respondent contends that a forgiveness of the debt of some $13,000 was probably connected with that property. Petitioner's accountant testified that all of the personal property in question had been returned or accounted for through payment and that the petitioner had realized no gain whatsoever in connection with it. He also testified that all profits realized from the sale of cattle, fruit, etc., were reported for income tax purposes in the year in which realized. The respondent introduced no evidence and we find no basis upon which his position can be rested. Under the circumstances, we conclude that the petitioner has not realized a gain from the involuntary conversion of property which it did not own and that it did not realize gain by reason of forgiveness of any debt in connection with the leasehold property. Decision will be entered under Rule 50. Footnotes
*. This figure represents the sum paid by Brophy individually to H. R. Welch for the latter's shares of stock in Brophy and Co.↩